## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

                      Plaintiff,

v.                                         Case No: 8:02-cr-329-T-17-EAJ

JOAQUIN MARIO
VALENCIA-TRUJILLO,.
                        Defendant.

_____/

## DEFENDANT'S MOTION FOR PRODUCTION OF THE GRAND JURY TRANSCRIPT OF FBI SPECIAL AGENT RODRICK HUFF PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE, RULE 6(e)(3)(E)(i) OR IN THE ALTERNATIVE FOR AN IN CAMERA REVIEW OF THE TRANSCRIPT DUE TO DEFENDANT'S "PARTICULARIZED NEED" AND SUPPORTING MEMORANDUM OF LAW

**COMES NOW**, the Defendant, JOAQUIN MARIO VALENCIA-TRUJILLO, by and through his undersigned counsel, and respectfully files this Motion for Production of the Grand Jury Transcript of FBI Special Agent Rodrick Huff pursuant to Federal Rule of Criminal Procedure, Rule 6(e)(3)(E)(i) or in the alternative for an *In Camera* Review of the Transcript due to Defendant's "Particularized Need" and Supporting Memorandum of Law.  In support of said Motion, the Defendant states as follows:

## PROCEDUREAL FACTS AND BACKGROUND

1.      On August 22, 2002, a federal grand jury sitting in the Middle District of Florida returned a four- (4) count indictment naming a single defendant, Joaquin Mario Valencia-Trujillo.  *See* Indictment, Exhibit "A."[1]  To present the supporting information in which to consider the indictment, the United States Attorney presented to the Grand Jury the testimony of FBI Special Agent, Rodrick D. Huff, as the only substantive witness against Joaquin Mario Valencia-Trujillo.

---

[1] Exhibits "A" through "J" are contained in the bound booklet of exhibits filed on February 7, 2005 (Doc.76), and will not be refiled unless the Court so requests. With the Court's permission, defendant filed the exhibit book non-electronically.

2.     As this Honorable Court is well aware, on November 22, 2002, Federal Bureau of Investigation Special Agent Rodrick D. Huff swore and subscribed as true and accurate a 139-page affidavit in support of the extradition of Joaquin Mario Valencia Trujillo.  Huff's affidavit cites evidence dating back to 1988 in support of all four counts of the indictment.

3.     Upon information and belief, the information contained within the 139-page affidavit is the same information supplied by Special Agent Huff to the Federal Grand Jury empanelled to hear the evidence presented against the Defendant on August 22, 2002.

4.     On March 31, 2003, the United States Embassy issued Diplomatic Note 449 to the Colombian government requesting the extradition of Valencia-Trujillo to stand trial for the charges in the Indictment.   Diplomatic Note 449 stated that the United States Embassy simultaneously provided authenticated documents, namely the March 4, 2003 "Affidavit in Support of Request for Extradition" sworn to and subscribed by AUSA Joseph Ruddy before United States Magistrate Judge Scriven.  *See* Ex. "D."  Attached to that affidavit as an exhibit was the 139 page affidavit[2] of Agent Rodrick Huff dated November 22, 2002, and sworn to and subscribed before United States Magistrate Judge Mark Pizzo. *See* Ex. 1.  In the March 24, 2003 cover letter from the Department of Justice (DOJ) to the Department of State conveying Valencia's formal extradition documents, the DOJ clarified that,

> Additionally, please note the typographical error in the Agent's affidavit, page 139, paragraph 540, where the agent requests for the issuance of a provisional warrant for the arrest of Joaquin Mario Valencia Trujillo.  The agent should have asked for the extradition of Joaquin Mario Valencia Trujillo.

*See* Ex. 2.  On the same date, the Office of Internal Affairs of the Criminal Division of the Department of Justice certified that Huff's affidavit was offered in support of the extradition of Valencia.  *See* Ex. 3.

---

[2]Huff's affidavit is dated November 22, 2002, and the government filed a copy on April 29, 2005.  *See* "Government's Notice of Filing" (Doc. 114).

5.      The specific post-1997 conduct outlined in Diplomatic Note 449, corresponded precisely with the specific post-1997 allegations outlined in Huff's affidavit. *See* Huff Affidavit, pages 103-139, particularly: 1) ¶¶ 377-378 (September 1998 maritime smuggling incident); 2) ¶¶ 379-386 (February 1999 seizure of cargo container in Colombia); 3) ¶¶ 387-419 (seizure of M/V Rebelde); 4) ¶¶ 420-445 (seizure of M/V Layney D); and 5) ¶¶ 446-528 (New York City organization). Thus, the United States government provided the government of Colombia, through the Huff affidavit, the alleged post-1997 factual basis for the extradition request.

6.      The five specific instances of post-1997 criminal conduct alleged in Diplomatic Note 449 correspond precisely with the ten alleged post-1997 predicate acts alleged in Count Three[3] of the Indictment. Each of the five events described in the Huff affidavit and again in Diplomatic Note 449 have spawned two charged predicate acts. For instance, the September 1998 event was charged in predicate act 27 as possession with intent to deliver cocaine, and was charged again in predicate act 28 as importation of cocaine. This is true for the remaining four alleged events as well.

7.      On February 11, 2004, the nine judges of the Supreme Court of Justice of Colombia approved Valencia-Trujillo's extradition in a unanimous seventeen- (17) page opinion confirming that the documents provided by the United States government in support of its extradition request were the Indictment, Joseph Ruddy's Affidavit, and Rodrick Huff's Affidavit. *See* Ex. "E," p. 3. The Colombian Supreme Court explained "On his part, agent Rodrick Huff describes in detailed manner, the actions . . . and participation of [Valencia-Trujillo]." *Id*. at 4.

8.      Accordingly, two weeks later Colombian President Alvaro Uribe-Velez issued an executive order of extradition.

---

[3]These predicate acts are former predicate acts 27-36. In its "Order Adopting Report and Recommendation," (Doc. 187), this Court granted defendant's request to redact alleged predicate acts 1-26 in Count Three. At trial, then, the redacted indictment renumbered predicate acts 27-36 as 1-10.

9.      In summary, from the extradition documents it is clear that the United States government elicited the Colombian government's agreement to extradite Valencia on the assurance that sufficient evidence existed that Valencia was involved with the five alleged instances of criminal conduct occurring after December 17, 1997, which the Government contended was supported by the affidavit of Special Agent Huff.  The sole evidentiary basis for these five alleged events, according to the United States, is Agent Huff's affidavit.

10.     On March 6, 2006, Defendant filed a Motion to Invalidated His Arrest and Involuntary Extradition and Motion for *Franks* Hearing along with Exhibits supporting Defendant's Motion. (Dkt. 352).  Pursuant to 28 U.S.C. § 636(c) and Local Rule 6.01(b), M.D. Fla., the United States District Court referred this matter for further consideration and proceedings to United States Magistrate Judge Elizabeth Jenkins.

11.     On March 20, 2006, the Government filed their response to Defendant's Motion. (Dkt. 361).  On March 28, 2006, Defendant filed his reply to the Government's response to Defendant's Motion. (Dkt. 368-2).

12.     On April 5, 2006, the United States Magistrate Judge Jenkins heard Oral argument on whether a *Franks* hearing should be granted.

13.     On April 17, 2006, the United States Magistrate Judge Jenkins issued her Report and Recommendation denying Defendant's Motion in its entirety.  (Dkt. 386).

14.     On May 1, 2006, Defendant filed his Objections to the United States Magistrate's Report and Recommendation.  (Dkt. 390).

15.     On May 9, 2006, the Government filed its Response to Defendant's Objections to the United States Magistrate's Report and Recommendation.  (Dkt. 400).

16.     On May 12, 2006, the United States District Court ordered that the Report and Recommendation dated April 17, 2006 (Dkt. 386) be adopted and incorporated by reference and

the objections be overruled, and the Defendant's motion to invalidate arrest and involuntary extradition and for *Franks* hearing be denied.  (Dkt. 410).

17.     On July 5, 2006, the trial of Joaquin Mario Valencia-Trujillo commenced with evidence and concluded on October 25, 2006 with a verdict.

18.     On February 1, 2007, this Honorable Court sentenced and entered Judgment to Joaquin Mario Valencia-Trujillo on Count(s) 1, 2, 3, with a sentence of 480 months imprisonment to run concurrent; Supervised Release for a period of 60 Months to run concurrent, no fine and a Special Assessment of $100 for each Count; On Count 4 the Defendant was sentenced to 240 months imprisonment to run concurrent with Counts 1, 2 and 3 followed by 36 months of Supervised Release, no fine and a Special Assessment of $100.  (See, Dkt 817).

19.     On February 1, 2007, Defendant, through his appointed counsel, filed his Notice of Appeal on this matter.  (Dkt. 818).  Defendant is currently preparing his appeal brief and will file the same upon the conclusion of all related hearing and trial transcripts.  Defendant intends to raise the previously litigated issues of the Motion for the Rule of Specialty and the Motion for a Franks Hearing previously denied by the Court.  Therefore, the transcript of the testimony of Special Agent Huff is critical to the issues to be raised on appeal by the Defendant.

## **MEMORANDUM OF LAW**

**I     THE GRAND JURY PROCESS**:

In the matter before the Court, the trial witnesses presented against the Defendant did not provide any testimony before the Federal Grand Jury who considered the indictment and evidence against Mr. Valencia-Trujillo.  Special Agent Huff was the only witness called on behalf of the presentation of the facts and evidence in consideration of the indictment by the United States Attorney to the Grand Jury.  Oddly enough the Government did not offer as a witness the Case Agent (Special Agent Huff) as a witness in the trial of Mr. Valencia-Trujillo. Even if the defense had called Special Agent Huff in their defense case-in-chief, there was an

argument to be made that the defense would not have been entitled to the Grand Jury transcript of Special Agent Huff.

The Defendant strongly asserts, as he has from the start of his challenges to the affidavit of extradition and the Motions for a *Franks* hearing, that the presentation of evidence in this matter at the Extradition and Grand Jury stages was secured through false and fabricated evidence and testimony presented through the testimony of FBI Special Agent Rodrick Huff.

In this quest of convincing this Honorable Court to order the immediate production of the Grand Jury transcript of the testimony of Special Agent Huff, or in the alternative to conduct an In Camera review, the Defendant bares the burden to show a **"particularized need"** for the production of the transcript.

To obtain grand jury testimony, a defendant must show a particularized need, sufficient to justify the revelation of generally secret grand jury proceedings. *Dennis v. United States*, 384 U.S. 855, 970, 161 L.Ed.2d 973, 86 S.Ct. 1840 (1966); *United States v. Proctor & Gamble Co*. 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed2d 1077 (1958) as cited in the matter of *Miller v. Wainwright*, 798 F.2d 426 (C.A.11 (Fla.), 1986).  As outlined in *Dennis*, Mr. Valencia-Trujillo is requesting that this Honorable Court at a minimum perform an "*In Camera*" review of the Grand Jury Transcript of Special Agent Huff to confirm the representations made in this Motion are in fact true in Defendant's effort to show his particularized need for the production and to show a clear and present Due Process violation of the Defendant's Constitutional Rights.

The United States Supreme Court has recognized the 'long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts.'  *United States v. Proctor & Gamble Co*. 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed2d 1077 (1958).  And it has ruled that, when disclosure is permitted, it is to be done 'discretely and limitedly.' Id., at 683, 78 S.Ct., at 987.

In the case of *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed2d 1323 (1959), the United States Supreme Court sustained a trial court's refusal to order disclosure of a witness' grand jury testimony where the defense made no showing of need, but insisted upon production of the minutes as a matter of right, and where there was 'overwhelming' proof. of the offense charged without reference to the witness' trial testimony.

"In general, however, the United States Supreme Court has confirmed the trial court's power under Rule 6(e) of the Federal Rules of Criminal Procedure to direct disclosure of grand jury testimony 'preliminarily to or in connection with a judicial proceeding. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940), the Court acknowledged that 'after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." *Dennis v. United States*, 384 855, 86 S.Ct. 1840, 16 L.Ed2d 973 (1966), see also, *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed2d 1323 (1959). "The burden, however, is on the defense to show that 'a particularized need' exists for the minutes, which outweighs the policy of secrecy." *Pittsburgh Plate Glass Co.* at 400. In this matter, the need for secrecy is no longer an issue. The ends of justice require disclosure due to the Defendants Due Process rights and the initial showing he presents of clear misrepresentations within this Motion and arguments.

In *Procter & Gamble*, supra, the Supreme Court stated that 'problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility * * *' are 'cases of particularized need where the secrecy of the proceedings are lifted discretely and limitedly.' 356 U.S., at 683, 78 S.Ct., at 987. "We hold that a much more particularized, more discrete showing of need is necessary to establish 'good cause.' Id.

In *Pittsburgh Plate Glass*, supra, four members of the Court concluded that even on the special facts of that case the witness' grand jury testimony should have been supplied to the defense, the entire Court agreed that upon a showing of 'particularized need' defense counsel

might have access to relevant portions of the grand jury testimony of a trial witness, 360 U.S., at 400, 405, 79 S.Ct., at 1241, 1244.[4]   In a variety of circumstances, the lower federal courts, too, have made grand jury testimony available to defendants.[5]

"These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice.  This realization is reflected in the enactment of the so-called *Jencks* Act, 18 U.S.C. § 3500 (1964 ed.), responding to this Court's decision *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, which makes available to the defense a trial witness' pretrial statements insofar as they relate to his trial testimony." [6]  *Dennis v. United States, supra.*

"The institution of the grand jury is deeply rooted in Anglo-American history.   In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury." *Costello v. United States*, 350 U.S. 359, 361-362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).  "The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been

---

[4] Because there had been no request for in camera judicial inspection of the grand jury minutes, the Court in *Pittsburgh Plate Glass* did not pass upon the adequacy of that technique for protecting a defendant's interests. 360 U.S., at 401, 79 S.Ct., at 1241.

[5] See, e.g., *United States v. Remington*, 191 F.2d 246, 250, 251 (C.A. 2d Cir. 1951), cert. denied, 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325 (defendant charged with commission of perjury before the grand jury); *Atlantic City Electric Co. v. A. B. Chance Co.* 313 F.2d 431 (C. A. 2d Cir. 1963) (use by private plaintiff in antitrust suit of witness' grand jury testimony); and cases cited in note 21, infra.

[6] 18 U.S.C. § 3500(b) reads in part: 'After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement * * * of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. * * *' Subsection (e) defines 'statement' for purposes of the Act.

committed and the protection of citizens against unfounded criminal prosecutions." *Branzburg v. Hayes*, 408 U.S. 665, 686-687, 92 S.Ct. 2646, 2658—2659, 33 L.Ed.2d 626 (1972).

"Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry.  The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. 'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919).

"The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement.  A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person.  The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged." *Branzburg v. Hayes*, supra, 408 U.s., at 700, 92 S.Ct., at 2665; *Costello v. United States, supra*, 350 U.S., at 364, 76 S.Ct., at 409.  (As cited in *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561, (1974)).

"The second, and no less important, task of the grand jury is to serv[e] the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed2d 569, (1962).  "To further the grand jury's

investigative function, the grand jury traditionally has been given "wide latitude" in its inquiries." *Calandra*, supra, 414 U.S. at 343, 94 S.Ct. at 617.  See also *United States v. Dionisio*, 410 U.S. 1, 17-18, 93 S.Ct. 764, 773, 35 L.Ed2d 67 (1973).  "Prosecutors have been accorded similar leeway in presenting their cases to the grand jury", see, e.g., *United States v. Adamo*, 742 F.2d 927, 936-938 (CA 6 1984) cert. denied, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed2d 975 (1985), but they are bound by a few, clear rules which were carefully drafted and approved by the United States Supreme Court and by Congress to ensure the integrity of the grand jury's functions."

"In reviewing the long established history and modus operandi of the grand jury, its establishment in the Constitution 'as the sole method for preferring charges in serious criminal cases' indeed 'shows the high place it (holds) as an instrument of justice." *Costello v. United States*, 1956, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397.  "Ever since this action by the Fathers, the American grand jury, like that of England, 'has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor.' *Id*. Indeed, indictments may be returned on hearsay, or for that matter, even on the knowledge of the grand jurors themselves. *Id*., 350 U.S. at pages 362, 363, 76 S.Ct. at pages 408, 409.  To make public any part of its proceedings would inevitably detract from its efficacy.  Grand jurors would not act with that independence required of an accusatory and inquisitorial body.  Moreover, not only would the participation of the jurors be curtailed, but testimony would be parsimonious if each witness knew that his testimony would soon be in the hands of the accused.  Especially this is true in antitrust proceedings where fear of business reprisal might haunt both the grand juror and the witness.  And this 'go slow' sign would continue as realistically at the time of trial as theretofore." *Pittsburgh Plate Glass*, supra

"It does not follow, however, that grand jury minutes should never be made available to the defense. The United States Supreme Court has long held that there are occasions, see *United*

*States v. Procter & Gamble*, supra, 356 U.S. at 683, 78 S.Ct. at page 987, when the trial judge may in the exercise of their discretion order the minutes of a grand jury witness produced for use on his cross-examination at trial.  Certainly 'disclosure is wholly proper where the ends of justice require it.' *United States v. Socony-Vacuum Oil Co.*, supra, 310 U.S. at page 234, 60 S.Ct. at page 849.  The burden, however, is on the defense to show that 'a particularized need' exists for the minutes, which outweighs the policy of secrecy." *Pittsburgh Plate Glass*, supra

"This 'indispensable secrecy of grand jury proceedings,' *United States v. Johnson*, supra, 319 U.S. at page 513, 63 S.Ct. at page 1238, must not be broken except where there is a compelling necessity.  There are instances when that need will outweigh the countervailing policy.  But they must be shown with particularity." *United States v. Procter Gamble Company*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).

This motion in question involves the testimony of the single key and relevant witness used by the United States Attorney's Office in the presentation of the indictment and relevant evidence against the Defendant.  The charges could not have been presented on the basis of evidence exclusive of the testimony of Special Agent Rodrick Huff.  Special Agent Huff summarized through his testimony hundreds of hours and pages of interviews and historical evidence as well as interviews of multiple alleged co-conspirators, co-defendants, and paid government informants.  It was basically uncorroborated testimony.  Agent Huff has alleged multiple facts within his 139-page affidavit that have now been clearly contradicted and discredited through the testimony of multiple witnesses throughout the trial of the Defendant Mario Valencia.  The Defendant clearly attempted to outlined these very issues with the Court pre-trial but was rebutted because the Government critically and unconstitutionally violated discovery rules and delayed production of *Brady* and *Giglio* documents until after this Honorable Court had denied Defendants Motion for a *Franks* hearing.

In each of the five areas outlined in Agent Huff's affidavit, witnesses in the trial of Mario Valencia completed contradicted the statements alleged by Agent Huff.  The only way the Defendant can affectively and accurately show to this Honorable Court the level of the prejudice suffered by the Defendant at the hands of Special Agent Huff as well as the clear trampling of his Due Process rights is through the production of the grand jury transcript showing the perjured testimony of the only witness offered by the Government, and that was FBI Special Agent Rodrick Huff.

As this Honorable Court is well aware, Mario Valencia was charged with multiple conspiracies.  The United States Supreme Court had noted that "A conspiracy case carries with it the inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants. See, e.g., *United States v. Bufalino*, 285 F.2d 408, 417-418 (C.A. 2d Cir. 1960) see also, *Dennis v. United States*, 384 855, 86 S.Ct. 1840, 16 L.Ed2d 973 (1966).  "Under these circumstances, it is especially important that the defense, the judge and the jury should have the assurance that the doors that may lead to truth have been unlocked.  In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts.[7]  Exceptions to this are justifiable only by the clearest and most compelling considerations.  *Dennis v. United States*, 384 855, 86 S.Ct. 1840, 16 L.Ed2d 973 (1966).

---

[7] See, for example, *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624, where this Court reversed a trial court's ruling which deprived defense counsel of an opportunity to inquire into the background of an important government witness; *United States v. Andolschek*, 142 F.2d 503, 506 (C. A. 2d Cir. 1944) (L. Hand, J.), where it was held the Government must produce reports—otherwise privileged—upon which the prosecution was based; *United States v. Coplon*, 185 F.2d 629, 636-639, 28 A.L.R.2d 1041 (C.A.2d Cir. 1960) (L. Hand, J.), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688, where the court held that defendants were themselves entitled to examine unlawfully taken tape-recordings of telephone conservations although the trial judge had determined that these recordings had not led the Government to evidence introduced at trial; and *People v. Ramistella*, 306 N.Y. 379, 118 N.E.2d 566 (1954), where the court ruled the State could not use evidence of a secret identification on an automobile to prove that the automobile was stolen where it was unwilling to disclose the location of the identification mark to the defense.

As stated in the Supreme Court opinion outlined in the matter of *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); "More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. There has been no deviation from that established principle. *Napue v. People of State of Illinois* 360 U.S> 264, 79 S.Ct. 1173, 3 L.Ed2d 1217; *Pyle v. State of Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed 214; *Alcorta v. State of Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed2d 9. There can be no retreat from that principle here.

## II.   DUE PROCESS VIOLATION:

The United States Supreme Court has stated that "Due Process" is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel, and the grand jury. This policy is predicated on the belief that deliberate deception of the court and the jury by the presentation of evidence known by the prosecutor to be false "involves[s] a corruption of the truth-seeking function of the trial process," *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed2d 342 (1976), and is "incompatible with `rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citation omitted). Moreover, deliberate deception is inconsistent with any principle implicit in "any concept of ordered liberty." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and with the ethical obligation of the prosecutor to respect the independent status of the grand jury. *Standards For Criminal Justice* § 3-3.5, 3-48-4-49 (2d ed.1980); *United States v. Hogan*, 712 F.2d 757, 759-60, (2nd Cir. 1983); [*People v. Pelchat*, 62 N.Y.2d 97, 476 N.Y.S.2d 79, 464 N.E.2d 447, 453 (1984)] (the "cardinal purpose" of the grand jury is to shield the defendant against prosecutorial excesses and the protection is destroyed if the prosecution may

proceed upon an empty indictment). *Anderson v. Secretary for Dept. of Corrections*, 462 F.3d 1319 (11th Cir. 2006).

The Supreme Court has stated clearly the constitutional rule governing what a Federal Prosecutor must do in the event he learns, prior to trial, that a grand jury witness testified falsely. Supreme Court decisions in the line of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), clearly establish that the prosecution may not suppress favorable and material evidence from the defense irrespective of the good faith or bad faith of the prosecution. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). And, "[a]s long ago as *Mooney  v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), [the Supreme Court] made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with `rudimentary demands of justice.'" *Giglio,* 405 U.S. at 153, 92 S.Ct. at 766; *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.").  Although these constitutional principles are well established, they pertain to the prosecution's suppression of evidence, or presentation of false evidence, *at trial.*

Defendant would assert to this Honorable Court that the duty of the United States Attorney to correct the multiple and uncorroborated falsities presented to the grand jury by Special Agent Huff should be without argument.  The only reason this Honorable Court had to order, re-order, threaten with sanctions and then eventually sanction the Assistant United State Attorney  in this matter was his continued and constant efforts of delay, delay and more delay in the production of *Brady* and *Giglio* required documents.

14

The Defendant must not that the extension of these principles from the trial setting to the grand jury setting, however, is far from clear.  In *Bracy v. United States,* for example, Justice Rehnquist denied an application to stay a judgment pending disposition of the petition for certiorari in a case where the applicants' chief contention was that their indictment should have been dismissed because a witness committed perjury before the grand jury.  *Bracy*, 435 U.S. 1301, 1301, 98 S.Ct. 1171, 1172, 55 L.Ed.2d 489 (1978).  The applicants in *Bracy* relied on cases such as *Mooney, Giglio,* and *Napue* in support of their contention that the prosecutor owes a duty to correct testimony introduced in grand jury proceedings which is later shown to be false. *Id.* at 1302, 98 S.Ct. at 1172.  Justice Rehnquist denied the application, stating:

"Because it seems to me that applicants misconceive the function of the grand jury in our system of criminal justice, I cannot conclude that four Justices of this Court are likely to vote to grant their petition.  The grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand his trial.  Because of this limited function, we have held that an indictment is not invalidated by the grand jury's consideration of hearsay, *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), or by the introduction of evidence obtained in violation of the Fourth Amendment, *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)".  While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that fact-finding process, its introduction before the grand jury poses no such threat.  I have no reason to believe this Court will not continue to abide by the language of Mr. Justice Black in *Costello", supra,* 350 U.S. at 363, 76 S.Ct. at 409: "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."  *Bracy,* 435 U.S. at 1302-03, 98 S.Ct. at 1172.

Therefore, it comes as no surprise that the Court denied the petition for certiorari. *Bracy v. United States*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). It appears Justice Rehnquist's comments in *Bracy* seem to suggest Supreme Court precedent would support a holding that an indictment is not invalidated by the grand jury's consideration of perjured testimony.

It is also unclear what role the petit jury's finding of guilt beyond a reasonable doubt would play in this situation. There is no Supreme Court precedent clearly establishing a constitutional rule that, irrespective of prosecutorial misconduct, an indictment must be dismissed because of perjured grand jury testimony where the perjurious testimony is not repeated before the petit jury, which convicts.

In *United States v. Mechanik,* the Supreme Court considered a case where the Fourth Circuit held that portions of a jury verdict had to be set aside because of a violation of Federal Rule of Criminal Procedure 6(d), which specified who could be present during a grand jury proceeding. 475 U.S. 66, 67, 106 S.Ct. 938, 940, 89 L.Ed.2d 50 (1986). The Supreme Court reversed and held that any violation of the rule was harmless beyond a reasonable doubt because "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." *Id.* at 70, 106 S.Ct. at 941-42. The Supreme Court, however, left open the possibility that some irregularities in the grand jury proceeding, such as racial discrimination in the selection of grand jurors, might not be harmless. *Id.* at 70 n. 1, 106 S.Ct. at 942 n. 1 (citing *Vasquez v. Hillery*, 475 U.S. 254, 106 S.Ct. 617, 88 L.Ed2d 598 (1986). Although *Mechanik* does not squarely address the situation presented in this case, it does not foreclose the Defendant's argument that despite the petit jury's conviction of the Defendant, the perjured grand jury testimony of Special Agent Huff was harmful and reversible error.

As the foregoing shows, Federal law, as determined by the Supreme Court, is not clearly established with respect to the Defendant's claim.   Although the Florida Supreme Court recognized in *Anderson v. Secretary for Dept. of Corrections*, 462 F.3d 1319 (11th Cir. 2006) a constitutional rule that "due process is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel, and the grand jury," it concluded Petitioner Andreson's due process rights had not been violated because the informant, Beasley's false testimony was not material to the grand jury's decision. *Anderson,* 574 So.2d at 91-92. The Court noted: "Were we to somehow disagree with that conclusion, we could not say the Florida Supreme Court's decision was "contrary to" or "an unreasonable application of . . . *clearly established* Federal law, as determined by the Supreme Court of the United States." *Anderson,* 574 So.2d at 91-92. In the case before this Honorable Court, the relevant facts are just the opposite.   Special Agent Huff's testimony was directly material to the grand jury's decision because he was the only witness presenting evidence and his transcript will directly and sufficiently shows the impact and broad spectrum of information he provided to the grand jury for their consideration.

## ARGUMENT

I.      **"Preliminarily to or in connection with a judicial proceeding."**

**Federal Rule of Criminal Procedure, Rule 6(e)(3)(E)(i) and (ii)** address the Court's authority to disclose "**Grand Jury**" proceedings, and states in relevant part as follows:

**RULE 6:  GRAND JURY:**
**(e) Recording and Disclosing the Proceedings.**

   *(3) Exceptions*.

      (A) Disclosure of a grand-jury matter—other than the grand jury's deliberations or any grand juror's vote—may be made to:

      (E) The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter:

(i) preliminarily to or in connection with a judicial proceeding;

(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;

(F) A petition to disclose a grand-jury matter under Rule 6(e)(3)(E)(i) must be filed in the district where the grand jury convened. Unless the hearing is ex parte—as it may be when the government is the petitioner—the petitioner must serve the petition on, and the court must afford a reasonable opportunity to appear and be heard to:

(i) an attorney for the government;

(ii) the parties to the judicial proceeding; and

(iii) any other person whom the court may designate.

The United States Supreme Court first addressed this rule that applies to this subsection in the matter of *Douglas Oil of California v. Petrol Stops Northwest*, 441 U.S. 211, 60 L.Ed.2d 156, 99 S.Ct. 1667 (1979). "We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings. See, *e. g., United States v. Procter & Gamble Co., supra.*[8] In particular, we have noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if pre-indictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as

---

[8] Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye. See Calkins, Grand Jury Secrecy, 63 Mich.L.Rev. 455, 457 (1965). The rule of grand jury secrecy was imported into our federal common law and is an integral part of our criminal justice system. *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); *United States v. Johnson*, 319 U.S. 503, 513, 63 S.Ct. 1233, 1238, 87 L.Ed. 1546 (1943). Federal Rule Crim.Proc. 6(e) codifies the requirement that grand jury activities generally be kept secret, by providing:

"A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, [or] an attorney for the Government . . . shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. . . . A knowing violation of rule 6 may be punished as a contempt of court."

Although the purpose for grand jury secrecy originally was protection of the criminally accused against an overreaching Crown, see Calkins, Grand Jury Secrecy, *supra*, with time it came to be viewed as necessary for the proper functioning of the grand jury. See n. 10, *infra*.

they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.[9]

For all of these reasons, courts have been reluctant to lift unnecessarily the veil of secrecy from the grand jury. At the same time, it has been recognized that in some situations justice may demand that discrete portions of transcripts be made available for use in subsequent proceedings. See, *e. g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940). Indeed, recognition of the occasional need for litigants to have access to grand jury transcripts led to the provision in Fed.Rule Crim.Proc. 6(e)(2)(C)(i) that disclosure of grand jury transcripts may be made "when so directed by a court preliminarily to or in connection with a judicial proceeding."

In *United States v. Procter & Gamble Co.*, the Court sought to accommodate the competing needs for secrecy and disclosure by ruling that a private party seeking to obtain grand jury transcripts must demonstrate that "without the transcript a defense would be greatly prejudiced or that without reference to it an injustice would be done." 356 U.S., at 682, 78 S.Ct., at 986. Moreover, the Court required that the showing of need for the transcripts be made "with particularity" so that "the secrecy of the proceedings [may] be lifted discretely and limitedly."

---

9 *United States v. Procter & Gamble*, n. 6, 78 S.Ct. 983, 986, n. 6, 2 L.Ed.2d 1077 (1958), we said that the reasons for grand jury secrecy had been summarized correctly United States v. Rose, 215 F.2d 617, 628-629 (CA3 1954):

" '(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.' "

*Id.*, at 683, 78 S.Ct., at 987. Accord, *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959).

*Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, (1966), the Court considered a request for disclosure of grand jury records in quite different circumstances. It was there held to be an abuse of discretion for a District Court in a criminal trial to refuse to disclose to the defendants the grand jury testimony of four witnesses who some years earlier had appeared before a grand jury investigating activities of the defendants. The grand jury had completed its investigation, and the witnesses whose testimony was sought already had testified in public concerning the same matters. The Court noted that "[n]one of the reasons traditionally advanced to justify nondisclosure of grand jury minutes" was significant in those circumstances, *id.*, at 872 n. 18, 86 S.Ct., at 1850 n. 18, whereas the defendants had shown it to be likely that the witnesses' testimony at trial was inconsistent with their prior grand jury testimony.

From *Procter & Gamble* and *Dennis* emerges the standard for determining when the traditional secrecy of the grand jury may be broken: Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.[10] Such a showing must be made even when the grand jury whose transcripts are sought has concluded its operations, as it had in *Dennis*. For in considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the

---

[10] As noted in *United States v. Procter & Gamble Co.,* 356 U.S., at 683, 78 S.Ct. at 987, the typical showing of particularized need arises when a litigant seeks to use "the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like." Such use is necessary to avoid misleading the trier of fact. Moreover, disclosure can be limited strictly to those portions of a particular witness' testimony that bear upon some aspect of his direct testimony at trial.

likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties. Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a company under investigation. Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities.

It is clear from *Procter & Gamble* and *Dennis* that disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure.  It is equally clear that as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification. Accord, *Illinois v. Sarbaugh*, 552 F.2d 768, 774 (CA 7), cert. denied *sub nom. J. L. Simmons Co, v. Illinois,* 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed2d 174, (1977); *U.S. Industries, Inc. v. United States District Court*, 345 F.2d 18, 21 (CA9), cert. denied, 382 U.S. 814, 86 S.Ct. 32, 15 L.Ed.2d 62 (1965); 1 C. Wright, Federal Practice & Procedure § 106, p. 173 (1969).  In sum, as so often is the situation in our jurisprudence, the court's duty in a case of this kind is to weigh carefully the competing interests in light of the relevant circumstances and the standards announced by this Court. And if disclosure is ordered, the court may include protective limitations on the use of the disclosed material, as did the District Court in *Douglas Oil Company of California v. Petrol Stops Northwest*, 441 U.S. 211, 60 L.Ed.2d 156, 99 S.Ct. 1667 (1979).  Moreover, we emphasize that a court called upon to determine whether grand jury transcripts should be released necessarily is infused with substantial discretion. See *Pittsburgh Plate Glass Co. v. United States, supra*, at 399, 79 S.Ct. 1237, at 1240, 3 L.Ed.2d 1323.

Applying these principles to the present case, the trial in the matter of the Defendant has concluded.  This Honorable Court therefore must assess this request pursuant to the Supreme

Court's standards as outlined herein.  This Honorable Court must apply the standards enunciated in *Procter & Gamble,* which requires a court to examine the extent of the need for continuing grand jury secrecy, the need for disclosure, and the extent to which the request was limited to that material directly pertinent to the need for disclosure.

Therefore, Defendant's need for disclosure in this request is great due to the Defendant's need to show in support of their appeal issue regarding the Defendant's appellate challenge to the Court's denial of the Defendant's Motion for a *Franks* hearing.  Defendant has tailored this request to only the transcript of Special Agent Huff and not the entire Grand Jury minutes, which comprised the indictment presentation.

II.     "**Defendant's Request Must be Made to District Court and not Court of Appeals**"

The Court in *Douglas Oil Company of California v. Petrol Stops Northwest*, 441 U.S. 211, 60 L.Ed.2d 156, 99 S.Ct. 1667 (1979) stated; "….It had no occasion to consider which court or courts may direct disclosure of grand jury minutes under Fed.Rule Crim.Proc. 6(e).[11] The federal courts that have addressed the question generally have said that the request for disclosure of grand jury minutes under Rule 6(e) must be directed toward the court under whose auspices the grand jury was empanelled. See *Illinois v. Sarbaugh, supra,* 772-773; *Gibson v. United States.* 131 U.S. App.D.C. 143, 403 F.2d 166, 167 (1968); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 21 F.R.D. 233, 235 (1957); accord, 1 Wright, *supra*, at § 106, p. 174. *United States v. American Oil*, Co. 264 F.Supp. 93, 95 (ED Mo. 1966). Indeed, those who seek grand jury transcripts have little choice other than to file a request with the court that supervised the grand jury, as it is the only court with control over the transcripts."

---

[11] In each of the three cases in which this Court has considered the applicable standard for disclosure of grand jury transcripts, the court in which the grand jury was empanelled also was the location of the litigation giving rise to the request for disclosure. See, *e. g.*, Juris. Statement in *United States v. Procter & Gamble Co.*, O.T.1957, No. 51, p. 3. Indeed, *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, (1966), and *Pittsburgh Plate Glass Co, v. United States*, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed2d 1323 (1959), the parties requested transcripts for use in the criminal case to which the grand jury proceedings had been a prologue.

"Quite apart from practical necessity, the policies underlying Rule 6(e) dictate that the grand jury's supervisory court participate in reviewing such requests, as it is in the best position to determine the continuing need for grand jury secrecy. Ideally, the judge who supervised the grand jury should review the request for disclosure, as he will have first-hand knowledge of the grand jury's activities. But even other judges of the district where the grand jury sat may be able to discover facts affecting the need for secrecy more easily than would judges from elsewhere around the country. The records are in the custody of the district court, and therefore are readily available for reference. Moreover, the personnel of that court and particularly those of the United States Attorney's office who worked with the grand jury—are more likely to be informed about the grand jury proceedings than those in a district that had no prior experience with the subject of the request. We conclude, therefore, that, in general, requests for disclosure of grand jury transcripts should be directed to the court that supervised the grand jury's activities." *Douglas Oil Company of California v. Petrol Stops Northwest*, 441 U.S. 211, 60 L.Ed.2d 156, 99 S.Ct. 1667 (1979).

A few years later, the Supreme Court emphasized the flexible nature of this test to accommodate different circumstances where perhaps the requirements of secrecy are granter than in others. *United States v. Sells Engineering*, 77 L.Ed.2d 743, 103 S.Ct. 3133, 463 U.S. 418 (1983). Also in 1983, the Supreme Court shed light on the actual meaning of the phrase, "preliminary or in connection with a judicial proceeding":

Rather the Rule contemplates only uses related fairly directly to some identifiable litigation, pending or anticipated. Thus it is not enough to show that some litigation may emerge from the matter in which the materials is to be used, or even that litigation is factually likely to emerge. The focus is on the ***actual use*** to be made of the material. If the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under [the previous (C)(i)] is not permitted.

*United States v. Baggot*, 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983).

Other Courts have found a "particularized need" that outweighs the requirement for secrecy in several different cases. *Dale v. Bartels*, 532 F. Supp. 973, (D.C.N.Y. 1981)(disclosure authorized in civil-rights litigation brought by a physician who was indicted based a allegedly false testimony given by federal agents, where nine years had passed, and there was not indication that ongoing investigations would be compromised, that potential indictees would escape or suborn perjury, or that grand jurors would be importuned); *In re Grand Jury Proceedings, GJ-76-4 & GJ-75-3*, 800 F.2d 1293 (4th Cir. 1986)(disclosure authorized to Civil Division of Department of Justice to defend against a civil law suit where materials had already been released to opposing party); *U.S. Industries, Inc. v. United States District Court*, 345 F.2d 18 (9th Cir 1965) (disclosure authorized where only party already had access to the grand jury material in question and it would be inequitable not to allow access to the other party); *In re Corrugated Container Antitrust Litigation (Anchor Hocking Corp. v. St. Joe Container Corp.*, 687 F.2d 52 (1982) (disclosure of grand jury proceedings authorized in civil action where witnesses that had testified before grand jury experienced considerable and frequent difficulty in recalling events, or invoked privilege against self-incrimination, grand jury had disbanded, and plaintiffs were unable to compel deposition testimony of witnesses who claimed privilege).

In the instant case, the Defendant will suffer an injustice and irreparable injury in his post-conviction proceeding if this single transcript(s) are not disclosed to assist in his appeal and the need for disclosure clearly outweighs the need for continued secrecy, and his request is structured to cover only material so needed.

Upon completion of the trial, the Defendant can now prove to this Honorable Court the two- (2) different versions under oath that were presented in this matter. The version presented to the Grand Jury by Special Agent Huff and the version, which actually was submitted by the Government in its case-in-chief. The contradictions cannot and should not be ignored or merely

dismissed as irrelevant but must be reviewed as fundamental to the Due Process Rights of the Defendant as well as shear constitutional fairness of the judicial process.

In Defendant's original Motion (Dkt. 352), the Defendant outlined what it argued were the intentional misrepresentations of Special Agent Huff in the five-(5) listed areas of allegations in his affidavit for Extradition.  (See, Dkt. 352).  As this Honorable Court is well aware, there were considerable pre-trial motions filed, argued and litigated by the Defendant challenging the four corners of the truthfulness of the affidavit of Special Agent Huff.  On April 5, 2006, this Honorable Court even allowed Oral Argument where the Government argued the Defendant had not met its burden of proof because they had not presented sufficient and convincing evidence regarding the lack of truthfulness of Special Agent Huff's statements within his affidavit.

Most compelling is the fact that only **_AFTER_** Defendant's *Franks* Motion was denied, was the Defendant provided with some of the damaging documents and evidence, which clearly and definitively proved Special Agent Huff's intentional and reckless misrepresentations to the Federal Grand Jury.

As this Court is well aware, the five areas of allegations were:

**(1)  The Alleged September 20, 1998 Smuggling Venture (Predicate Acts 27 & 28);**

**(2)  The Alleged February 15, 1999 Attempt to Use Shipping Containers in Colombia to Smuggle Cocaine by Commercial Freight Ship (Predicate Acts 29 & 30);**

**(3)  The Alleged Involvement of Valencia in the February 2000 Attempted Smuggling Venture Aboard the F/V Rebelde (Predicate Acts 33 & 34);**

**(4)  The Alleged Involvement of Valencia in the April 5, 2000 Smuggling Operation Involving the F/V Layney D (Predicate Acts 35 & 36); and**

**(5)  The Alleged Involvement of Valencia in a New York City Cocaine Distribution Organization Uncovered on May 1, 2000 (Predicate Acts 31 & 32).**

## I.      FIRST ALLEGATION

*The Alleged September 20, 1998 Smuggling Venture (Predicate Acts 27 & 28)*

## A.   ALLEGATIONS IN HUFF'S AFFIDAVIT

The first of the five alleged post-1997 criminal events, forming alleged predicate acts 27-28, is described very briefly in ¶¶ 377-378 of Agent Huff's Affidavit.  Agent Huff attests that, on September 20, 1998, Pedro Navarette and his organization, using the boats F/V "Faraon V" and F/V "Dona Rosa," delivered "approximately 3,600 kilograms of cocaine to **Valencia's** Mexican associates in the Eastern Pacific Ocean." *Id*. at ¶ 377 (emphasis added).  Agent Huff asserts that Navarette charged Valencia an unknown fee, as well as $410,255.56 in expenses.  *Id*.  The only source of Agent Huff's information is Reynaldo Avenia-Soto and the financial records he claims to have created.[12]   Agent Huff attests that, during this period, Navarette conducted eleven maritime smuggling operations, but that only one, the September 20, 1998 venture, was conducted for Valencia.  *Id*.

Agent Huff attests he reviewed the financial records with Avenia-Soto, and then prepared the synopsis that includes the assertions regarding the September 20, 1998 operation. *Id*. at ¶ 358.

## B.   INTENTIONAL MISREPRESENTATIONS AND OMISSIONS

This information by Special Agent Huff is completely contradicted through the entries in Avenia-Soto's financial records and the trial testimony of Avenia-Soto that the Navarette organization did not work for the "Cali Cartel representative" in 1997 or 1998, and that the owner of the September 20, 1998 load was Exequiel Angulo.a/k/a Negro Exe.  To the contrary, Special Agent Huff in his affidavit states Avenia-Soto told him the owner of the September 20,

---

[12]Avenia-Soto was identified as "C.W. #5." In the Trial of the Defendant as well as in at least three trials in the Tampa Division of the Middle District of Florida.  Similarly, from media accounts and trial testimony, it is clear that "CW 1" is Jose Castrillon-Henao, and CW #10 is Monica Velilla a/k/a Yvette Garcia.

1998 shipment of cocaine was Mario Valencia. The trial exhibits used by Avenia-Soto in the trial of the Defendant showed otherwise.  *See* **Exhibit No. 14**.

Notably, Avenia-Soto testified on January 31, 2001 in the trial of *United States v. Quinones*, *supra,* that he does not know the names of the owners of the cocaine transported by Navarette on the September 20, 1998 smuggling trip:  *See* **Exhibit No. 15.**

According to Agent Huff's November 22, 2002 affidavit in this case, he recklessly represents that Valencia was the owner of the September 20, 1998 cocaine and attributes this information to Avenia-Soto.  Agent Huff makes this reckless assertion when he is more than aware that Avenia-Soto testified in January 2001 that Avenia-Soto did not know the owner of the September 20, 1998 shipment.  Combine this clear knowledge with the sworn statement of Special Agent Huff in his earlier affidavit, where he attests that the owner of the September 20, 1998 shipment was "an unknown subject" and you begin to see the absolute reckless and completely manufactured statements of Special Agent Huff within his affidavit in question. These set of facts were more than sufficient to show a false intentional misrepresentation by Special Agent Huff regarding his claim that Valencia is the owner of the September 20, 1998 cocaine.

## NEW EVIDENCE TO SUPPORT PRODUCTION OF THE GRAND JURY TRANSCRIPT OF AGENT HUFF

### I.     New Documentary Evidence regarding the Second Intentional Misrepresentation by Agent Huff

**After** this Honorable Court **DENIED** Defendant's *Franks* Motion and only one month before trial began on July 5, 2006, the Government mysteriously produced an interview of Avenia-Soto dated November 4, 2000, conducted by Special Agent Huff, which was transcribed into an FBI form 302 Report of Interview.  The November 4, 2000 FBI 302 memorandum begins as follows:  "During the period from July 3 through November 3, 2000, a source, who is in a position to testify, **has been working with Special Agent Rodrick D. Huff to identify,**

**translate and explain** the financial records he/she maintained as the bookkeeper for Jose

Castrillon Henao and Pedro Rafael Navarrete…" *See*, **Exhibit No. 16.**

During Defendant's trial from July 5, 2006 to October 25, 2006, defense counsel was

able to verify the individual referenced by Agent Huff in his November 4, 2000 FBI 302, was in

fact, Mr. Avenia-Soto.

This interview memorandum confirms Avenia-Soto was the sole source of information

related to the financial records.  No other source provided any information to show that Mario

Valencia was the owner of Operation of No. 5.  Therefore, Special Agent Huff intentionally and

recklessly misrepresented that the owner of Operation No. 5 was in fact Mario Valencia and not

Ezequiel Angulo a/k/a Negro Exe as reflected in the financial documents of Avenia-Soto, the

interview of Avenia-Soto and the trial testimony of Pedro Navarette.

As definitive proof of Agent Huff's intentional misrepresentation, one needs only to look

at Paragraph 13 of the November 4, 2000 report of interview, which was not made available until

after the *Frank's* Motion was submitted, heard and denied, which states in pertinent part the

following: *See*, **Exhibit No. 16.**

"On or around September 20, 1998, Navarrete and members of his drug trafficking organization
arranged for the maritime delivery of approximately three thousand six hundred (3600)
kilograms of cocaine to **unknown** Mexican associates in the Eastern Pacific Ocean.  The fishing
vessels utilized by the members of Navarrete's organization to deliver this load of cocaine were:
the F/V Faraon……  **For this venture, Navarrete was hired by Exequiel Angulo, a/k/a Negro
Ex or Negro Exequiel**."

As further confirmation of the intentional and reckless misrepresentation, the Defendant

was then provided a Report of Interview of Pedro Navarrete, prepared by Special Agent Huff and

others, dated August 4, 2003 and December 4, 2003(sp?).  Again, this report of interview was

not received by the defense until **AFTER** the *Frank's* Motion was submitted, heard and denied,

it states in Paragraph 7 the following: *See*, **Exhibit No. 28.**

"(Re:  Operation 5.)  Negro Exe:  **Navarrete advised that this code signified that this
smuggling operation was for Ezequil LNU**.  Navarrete further advised that Negro Exe also

worked for Mario Valencia, "running" an airport in Cali, CB, coordinating airdrop operations. Navarrete advised that he was introduced to a pilot, William LNU, through Negro Exe. According to Navarrete, **William also worked with TIO, a/k/a Guillermo Munoz, in Mexico. Navarrete advised that this load was also for Munoz, through William LNU…** Navarrete stated that this was a successful operation….. that he was paid directly by William LNU in Cali."

Therefore, these documents. (provided **<u>AFTER</u>** the Defendant's Motion and argument on the *Franks* issue) definitively prove to this Honorable Court what the Defendant was unable to prove at the Oral Argument hearing held on April 5, 2006.  These documents prove Special Agent Huff intentionally misrepresented in his affidavit, *see* ¶ 377, that Navarette's organization smuggled cocaine on September 20, 1998 to *Valencia's* Mexican associates.

## II.  <u>New Evidence from Trial Testimony of Government Witnesses during the Valencia Trial</u>

In further support of Special Agent Huff's intentional misrepresentation, was the trial testimony of Mr. Avenia Soto, where he testified that Operation No. 5 was for Ezequiel Angulo. There was no mention by Mr. Avenia Soto of Mario Valencia being the owner of Operation No. 5.  (Tr. T. of Avenia-Soto, July 20, 2006, Page 112-113, (Doc. 884))[13]

Consistent with this fact, was the trial testimony of Pedro Navarrete who testified that Operation No. 5 was for Angulo (Ezequiel Angulo a/k/a Negro Exe), William and Tio.  He emphatically denied that Operation No 5 was associated with Mario Valencia.  (Tr.T. July 27, 2006, Page 103-104, (Doc. 764)), see also, (Tr.T. July 26, 2006, Page 41-44, (Doc. 888)), and see also, (Tr.T. July 26, 2006, Page 15, (Doc. 763))

There is therefore clear and convincing evidence presented by the Defendant that Special Agent Huff intentionally and recklessly misrepresented the facts within his affidavit regarding the September 20, 1998 shipment of cocaine in his effort to implicate the Defendant Mario Valencia.

---

[13] "Tr. T." shall mean Trail Transcript of a witness in the Trial of United States v. Joaquin Mario Valencia-Trujillo, Case No. 8:02-cr-329.

As reflected in the hearing of May 15, 2006, AUSA Ruddy denies any existence of *Brady* material after repeatedly failing to adhere to this Honorable Court's consistent attempts to have the Government produce *Brady* and *Giglio* evidence by the deadlines set by the Court.  (H.T. May 15, 2006, page 7, lines 4-16)[14]  (*See*, **Exhibit No. 36**)  As this Honorable Court is well aware, there were multiple motions filed by the Defendant and multiple sanctions imposed by the Court due to AUSA Ruddy's clear pattern of delay and avoidance on the production of *Brady* and *Giglio* documents and evidence.  It is beyond argument that this tactic was only meant to keep the Defendant from having sufficient argument and evidence to produce and prove the intentional misrepresentations made by Special Agent Huff during the *Franks* hearing.

### III.     CONCLUSION:

This Honorable Court now has definitive proof of the intentional misrepresentation made by Special Agent Huff in his affidavit for extradition and certainly the exact testimony was offered in front of the grand jury that considered the charges against the Defendant Mario Valencia.   The Defendant will be severely prejudice without access to this transcript to show to this Honorable Court the level of deceit and deception that was part of the probable cause hearing presented to the grand jury by Special Agent Huff and AUSA Ruddy and to show the clear level of violation of the Defendant's Due Process Rights and Privileges.

### II.     SECOND ALLEGATION

### *The Alleged February 15, 1999 Attempt to Use Shipping Containers in Colombia to Smuggle Cocaine by Commercial Freight Ship (Predicate Acts 29 & 30)*

### A.     ALLEGATIONS IN HUFF'S AFFIDAVIT

---

[14] "H. T." shall mean Hearing Transcript in the matter of United States v. Joaquin Mario Valencia-Trujillo, Case No. 8:02-cr-329.

Special Agent Huff attests he reviewed United States Customs Service (USCS) reports of investigation (ROIs)[15] reflecting the USCS Jacksonville office received information on February 19, 1999 that, approximately four days earlier, Colombian law enforcement officers in Buenaventura, Colombia seized 300 kilograms hidden in a freight container consigned by Valencia's paper company, Unipapel, S.A. (Sociedad Anonima) to a Louisiana paper company, Sak 'N' Pak, Inc. *Id*. at ¶¶ 379-383.   According to Agent Huff, the container that allegedly contained cocaine was to be loaded on a freighter, the M/V "Trave Trader," in Buenaventura, Colombia, and was scheduled to enter the United States in Jacksonville, Florida.  *Id*. at ¶ 382. This alleged event corresponds to alleged predicate acts 29 and 30.

Agent Huff attests he reviewed additional USCS records that "document a long-term business relationship between Unipapel S.A. and Sak 'N' Pak." *Id*. at ¶ 383.

## B.     INTENTIONAL MISREPRESENTATIONS AND OMISSIONS

The sole basis for Huff's allegation of, "on February 15, 1999, Colombian police in Buenaventura seized 300 kilograms of cocaine from a Unipapel container aboard the M/V Lontue" is his assertion that a USCS ROI he reviewed so stated.  The government has never produced any reports claimed by Special Agent Huff to have reviewed.[16]

To the contrary, convincing evidence exists that no such seizure ever occurred.  First, a document authored by Captain Fernando Ivan Valderrama Castro of the Colombian National Antinarcotics Police reflects that the container, ICSU188840-8, left Buenaventura on February 11, 1999 destined for Houston, and contained bags of graph paper from Unipapel.  **Exhibit No. 17**.  More important, Captain Valderrama formally indicated, in his answer to a "rights petition" as provided by Colombian law, that his office possesses no documents regarding illicit activities

---

[15]No such reports have ever been produced in discovery despite Court order and repeated defense requests and motions for production.

[16]The government completely failed to provide this clear exculpatory information under *Brady*.

involving Unipapel in 1999.  *Id*.  According to another document, **Exhibit No. 18**, dated March 15, 1999, from the containers transport company, Crawley American Transport, to Unipapel, the M/V Trave Trader departed Buenaventura on February 11, 1999, four days before the alleged seizure.  According to the same document, the ship, with the container aboard, reached Jacksonville on February 25, 1999, and the container reached its final destination, New Orleans, on March 13, 1999.  *Id*.  Another document signed by an officer of the Colombian National Police reflects that a search was, in fact, conducted on February 9, 1999, and that law enforcement detected no contraband or narcotics.  **Exhibit No. 19**.  This document also reflects the container was destined for New Orleans.  *Id*.

Another document, by the Colombian tax agency DIAN, reflects the container was aboard the M/V Trave Trader when it left Buenaventura on February 10, 1999, destined for New Orleans.  **Exhibit No. 20**.  This document also reveals the freight agent was not Gran Muelle, but Fronteras Mundiales, Ltd.  *Id*.  Likewise, another document, the Bill of Lading, reflects the container, which contained 721 cases of brown paper bags, left aboard the M/V Trave Trader on February 11, 1999.  **Exhibit No. 21**.  This document also reflects the freight agent was Fronteras Mundiales, not Gran Muelle.  *Id*.  Similarly, a Certificate of Origin dated February 9, 1999 reflects the container of brown paper bags was destined for New Orleans.  **Exhibit No. 22**.  Also, a February 6, 1999 letter from Unipapel to the shipping company reflects the container is leaving for New Orleans on February 11, 1999, and the shipping agent is Fronteras Mundiales, not Gran Muelle.  **Exhibit No. 23**.  A letter from Unipapel to its shipping agent, Fronteras Mundiales, also reflects the container will leave on the M/V Trave Trader on February 11, 1999.  **Exhibit No. 24**.  Also, the authorization permitting the container to enter the port at Buenaventura reflects a final destination of New Orleans.  **Exhibit No. 25**.  Similarly, the February 9, 1999 invoice from Unipapel to Sweet Paper reflects shipment to New Orleans.  **Exhibit No. 26.**  Finally, the cargo

registry reflects the agent was Fronteras Mundiales and the destination was New Orleans.

**Exhibit No. 27**.

In summary, substantial evidence exists that the M/V Trave Trader was gone from the Port of Buenaventura days before the alleged February 15, 1999 search and seizure, that a search did occur before its departure but that law enforcement found no narcotics or contraband, that the container was scheduled to depart for New Orleans instead of Jacksonville, and finally that Valencia's company, Gran Muelle, was not the shipping agent for this container.

**NEW EVIDENCE TO SUPPORT PRODUCTION OF THE GRAND JURY TRANSCRIPT OF AGENT HUFF**

**I.      New Documentary Evidence regarding the Second Intentional Misrepresentation by Agent Huff**

After the government rested their case in the trial of Mario Valencia, the defense requested a Motion for Judgment of Acquittal on the allegations surrounding the events of February 15, 1999 and the Jacksonville container.   As a result of the defense motion, the government withdrew this predicate act from further consideration.

This action by the Government only serves to support and show Special Agent Huff did not review any documents from the US Customs Service indicating 300 kilograms of cocaine were hiding in a container bound for Jacksonville, Florida, as outline hereinabove.   In other words, **this is an intentional misrepresentation created by Agent Huff in an effort to establish Venue in the Middle District of Florida,** and to allege unproven and undocumented narcotics seizures connected to Mario Valencia.   This is also a clear example of a violation of *Brady*, as only one document was ever turned over to the defense in discovery.   Special Agent Huff clearly states he reviewed USCS reports of investigation.   No such reports have ever been produced, turned over to the defense, or presented at trial, nor are any documents even believed to exist to this day.

Therefore, the statement in Special Agent Huff's affidavit is clearly manufactured and made with recklessness and intentional disregard for the truth and intentionally misrepresents the allegation attributed by Special Agent Huff against Defendant Mario Valencia regarding a seizure of 300 kilos from a Jacksonville container.

## II.    CONCLUSION:

This Honorable Court now has even more definitive proof of the intentional misrepresentations made by Special Agent Huff in his affidavit for extradition.  This is the same or identical information given by Special Agent Huff to the grand jury, which considered the sufficiency of probable cause in which to return a true bill of the indictment.  The Defendant has shown the intentional misrepresentations of Special Agent Huff and the reckless manner in which he prepared his extradition affidavit.  This conduct has prejudiced the Defendant such that immediate production of the grand jury transcript must be authorized in order to protect the Defendant Constitutional rights and privileges.  The Defendant has shown particularized need for such production as this is his only avenue in which to retrieve this document.

## III.    THIRD ALLEGATION

### *The Alleged Involvement of Valencia in the Attempted Smuggling Venture Aboard the F/V Rebelde in February 2000 (Predicate Acts 33 & 34)*

### A.    ALLEGATIONS IN HUFF'S AFFIDAVIT

Agent Huff alleges, in ¶¶387-419, that Valencia is responsible for the cocaine seized aboard the F/V Rebelde.   These allegations correspond to alleged predicate acts 33 and 34.

Agent Huff asserts that one of the boats used by the Navarette smuggling organization was the F/V Rebelde.   *Id*. at ¶¶ 387-390.   Huff attests the F/V Rebelde recently left Buenaventura, and it contained cocaine destined for transfer to a Mexican boat in the Eastern Pacific.  *Id*. at ¶ 392.  Agent Huff informed other law enforcement agents and the Coast Guard, which seized the boat, discovering cocaine, on February 16, 2000.  *Id*. at ¶¶ 394-397.

However, Agent Huff then attests he reviewed debriefings of two unnamed (and otherwise unknown) informants employed by the DEA, claiming they both "directly implicated" Valencia in the F/V Rebelde seizure. *Id*. at ¶ 400. Based on his review of DEA reports,[17] Huff asserts the DEA interviewed the first informant within a month or so of the F/V Rebelde seizure. *Id*. at ¶ 403. The report stated, according to Huff, the informant claimed to be present at Valencia's home shortly after the seizure, and observed 30-35 cars present. *Id*. at ¶ 403. The report also stated, according to Huff, that the informant told the DEA one of Valencia's "associates" admitted to participating in the F/V Rebelde smuggling venture, complained about losing money, and "identified Valencia as the primary sponsor of the smuggling operation." *Id*. at ¶ 404.[18]

**[In February 2000]**, according to the DEA reports Agent Huff **attests he reviewed**, the "associate" told the informant the organization had just lost a very large load of cocaine to a seizure at sea. *Id*. at ¶ 414. The "associate" was upset the seizure occurred "very close to its point of destination, *id*. at 414, and Huff attests the F/V "Rebelde" was seized about 500 miles south of Acapulco, Mexico. *Id*. at 415.[19] "Thus," according to Huff, "based upon the timing of the statements by Valencia's associate to [the second informant] about the maritime seizure and his description of the seizure, your affiant respectfully submits that Valencia's associate was referring to the USCG interdiction of the F/V Rebelde when he complained to [the informant] that Valencia's shipment of cocaine had been seized." *Id*. at 417.

B.  **INTENTIONAL MISREPRESENTATION AND OMISSIONS**

---

[17]No such reports have been produced in discovery despite repeated defense requests.

[18]Again, Huff attests that he read: 1) a DEA agent's written statement that; 2) repeated an informant's statement; that 3) consisted of a "Valencia associate's" statement; consisting of 4) a statement made by Valencia.

[19]Acapulco is located in far southwestern Mexico.

Again, Huff relies on written reports[20] authored by DEA agents who, in turn, annotated the verbal statements of two unknown, unnamed informants. Huff, at least at the time of signing his affidavit, (November 22, 2002), had personally interviewed neither informant. Huff also attests the information provided by the informants was corroborated by the DEA by other "corroborating witnesses," "documentary analysis," and "other investigative techniques." Affidavit, ¶ 401. However, no information was ever provided that would further illuminate the nature of this collaboration, despite the fact, Special Agent Huff personally interviewed the informant Exaudi Santos in 2001 in Tampa, Florida.

The claims of the informants are squarely rebutted by Navarette himself, who made a sworn declaration on September 18, 2003 - six months before Colombia extradited Valencia - that on February 16, 2000 the M/V Rebelde was transporting cocaine on behalf of a Mexican organization, Navarette's organization, and Navarette himself. **Exhibit No. 51, page 6, lines 10-12**. Present during Navarette's statement were United States law enforcement officers, Assistant United States Attorney, Joseph Ruddy, Colombian law enforcement officers, Colombian prosecutors, and Navarette's defense counsel.

Agent Huff summarizes in his affidavit that Pedro Navarette managed, for the benefit of Valencia, the attempted cocaine smuggling venture aboard the F/V Rebelde in February 2000. Affidavit, ¶ 419. Contrary to this assertion by Agent Huff, Navarette's September 18, 2003 statement identifies all of the owners of the cocaine aboard the F/V Rebelde, and Valencia is not among them. **Exhibit No. 51**.

<u>**NEW EVIDENCE TO SUPPORT PRODUCTION OF THE GRAND JURY TRANSCRIPT OF AGENT HUFF**</u>

---

[20]This was a clear and material example of withholding exculpatory evidence, which the Government willfully failed to disclose to the Defendant.

I.   **New Documentary Evidence regarding the third Intentional Misrepresentation by Agent Huff**

On July 14, 2006 the Defendant was given for the **very first time** a Report of Interview (ROI) of Pedro Navarrete, that was prepared by Agent Meeks on July 22, 2003, with Agent Huff, AUSA Ruddy and others present:  (Note:  This report was not presented to the defense until July 14, 2006, after the *Frank's* motion was submitted, heard and denied.)  *See*, **Exhibit No. 29.**

¶ 10 states as follows:

**":The F/V Rebelde was a multi-ton cocaine smuggling venture  who's participants were:  Navarrete, Pinocho and Cebas from Colombia and TIO and Guero from Guadalajara, Mexico.  Navarrete advised that he knew the identities of all Colombian participants due to the fact that he attended meetings with each participant, prior to the departure of the F/V Rebelde.  Navarrete advised that Pinocho invested 4,000 kilograms, Cebas invested 500 kilograms, Navarrete invested 500 kilograms and the Mexicans (TIO and Guero) invested 2,000 kilograms…."**

On December 3, 2003 a second ROI was prepared after an interview with Pedro Navarrete, by Special Agent Meeks with Agent Huff, AUSA Ruddy and others present:  (Note:  This report was not presented to the defense until after the Frank's motion was submitted, heard and denied.  *See*, **Exhibit No. 30.**

¶ 10 states as follows:

**"The F/V Rebelde was a multi-ton cocaine smuggling venture who's participants were:  Navarrete, Pinocho and Sebas from Colombia and TIO and Guero from Guadalajara, Mexico.  Navarrete advised that he knew the identities of all Colombian participants due to the fact that he attended meetings with each participant, prior to the departure of the F/V Rebelde.  Navarrete advised that Pinocho invested 1,250 kilograms, Sebas invested 500 kilograms, Navarrete invested 500 kilograms and the Mexicans (TIO and Guero) invested 2,250 kilograms…."**

(Note:  Par. 11, 12, 13, 14 and 15 talk about the meeting between Navarrete and the partners in this drug transaction, as a result of the loss of the drugs in this shipment, who was responsible, and how the losses would be handled.

According to an undated ROI, (received by the defense without a normal heading which provides the date prepared, or the persons present), "On 7-26-01, SA's from the New York FD, Bogotá Co, and Tampa DO debriefed a source in Bogotá…." *See*, **Exhibit No. 31, page 1, ¶ 31.**

¶ 31 of this undated ROI states as follows:

**"The source told the officers that approximately four or five months prior to this interview (February or March 2001), Mafla mentioned to the source that the organization lost a load of drugs almost at the point of its destination.  Mafla added that he didn't know which was worse: to lose a load as it departs Colombia or to lose one almost as it reaches its destination."**

## II.    New Evidence from Trial Testimony of Government Witnesses during the Valencia Trial

During the trial of Mario Valencia, the Government called as a witness in their case-in-chief, Pedro Navarrete.  During cross-examination of Pedro Navarrete, he admitted to maintaining personal handwritten notes of who owned which shipments of cocaine.  These notes became Defendant's Exhibits No. 55 and No. 56.  (The failure to produce these notes are another obvious and clear *Brady* violation by the Government).  Nowhere in these notes does the name Mario Valencia appear.  AUSA Ruddy clearly knew of these notes, but the defense was deprive of them until admitted by Mr. Navarrete on the stand while testifying at trial. The testimony of Pedro Navarrete and his notes confirmed that Mario Valencia was never one of the true owners of the F/V Rebelde.  (Tr.T. July 27, 2006, Page 182-183, (Doc. 764)).  Therefore Special Agent Huff's assertion was absolutely false.

During trial, it was revealed that Government witness Exaudi Santos was one of the unnamed informants referenced by Special Agent Huff in his affidavit.

In the July 26, 2001 ROI of Ms. Santos, she stated she heard of the seizure of drugs on a ship, which was to have occurred in February 2001, not February 2000.  (*See*, **Exhibit No, 31**). Throughout the interview, Ms Santos never mentions the actual name of the F/V Rebelde.  In fact, Ms. Santos never refers to any seizure that took place in February 2000 as represented by

Special Agent Huff.  This fact clearly contradicts the statement made by Agent Huff in ¶ 414, where Agent Huff states Ms. Santos refers to a conversation overheard regarding a seizure of drugs, which occurred in February 2000.  Agent Huff states he learned this from a DEA report. The defense has never been provided a single DEA report where Ms. Santos refers to a drug seizure, which took place in February 2000.  In fact, according to the discovery provided to the Government, no such report exists.

As further confirmation of Agent Huff's intentional and reckless misrepresentation, Ms. Santos testified at trial, that the date of the seizure referenced in her ROI of July 27, 2001 was February 2001 and not February 2000.  It is more than obvious that Special Agent Huff merely manufactured and intentionally and recklessly misrepresented the statement attributed to Ms. Santos regarding the seizure of the F/V Rebelde, which was actually seized in February 2000.

## III.    CONCLUSION:

This Honorable Court now has even more definitive proof of the intentional misrepresentations made by Special Agent Huff in his affidavit for extradition.  This is the same or identical information given by Special Agent Huff to the grand jury, which considered the sufficiency of probable cause in which to return a true bill of the indictment.  The Defendant has shown the intentional misrepresentations of Special Agent Huff and the reckless manner in which he prepared his extradition affidavit.  This is the same or identical manner in which Special Agent Huff testified in the grand jury and which has substantially prejudiced the Defendant such that immediate production of the grand jury transcript must be authorized in order to protect the Defendant Constitutional rights and privileges.  The Defendant has shown is particularized need for such production as this is his only avenue in which to retrieve this damaging document.

## IV.    FOURTH ALLEGATION

### *The Alleged Involvement of Valencia in the April 5, 2000 Smuggling Operation Involving the F/V Layney D (Predicate Acts 35 & 36)*

### A.    ALLEGATIONS IN HUFF'S AFFIDAVIT

Agent Huff recklessly misrepresents and falsely alleges that the attempted maritime smuggling operation aboard the F/V Layney D was managed by Navarette, on Valencia's behalf. Affidavit, ¶ 445.  However, this conclusion is squarely contradicted by Navarette in his sworn statement of September 18, 2003, given six months before Valencia's extradition. **Exhibit No. 51**.

Agent Huff alleges that Mario Valencia was involved in a smuggling venture aboard the F/V Layney D, which the Coast Guard seized off the coast of Ecuador on April 5, 2000, seven weeks after the seizure of the F/V Rebelde.  Agent Huff's allegation of Valencia's alleged involvement in this venture corresponds to alleged predicate acts 35 and 36.

### B.    INTENTIONAL MISREPRESENTATIONS AND OMISSIONS

As in the F/V Rebelde seizure, Navarette's sworn statement, provided six months before Colombia extradited Valencia, identifies other persons as owners of the cocaine seized from the boat.[21]  Again, Navarette does not identify Valencia as among the group of owners of the cocaine aboard the F/V Layney D, and notably, the two drug organizations the informant allegedly identifies are not among the group either.

In summary, the baseless allegations that Valencia was involved in the F/V Rebelde and F/V Layney D come only from the words of Special Agent Huff.  The Government did not provide one bit of discovery confirming the information attributed to Agent Huff in his affidavit

---

[21]Again, Navarette made this statement in the presence of U.S. and Colombian law enforcement personnel, AUSA Ruddy, Columbian prosecutorial authorities, and Navarette's defense counsel.

and in fact, the trial testimony of Ms. Santos and Mr. Navarrete only serve to further show and support the reckless and intentional misrepresentation conducted by Special Agent Huff.   There was no absolutely no credible witness linking Valencia to the F/V Layney D venture.

## NEW EVIDENCE TO SUPPORT PRODUCTION OF THE GRAND JURY TRANSCRIPT OF AGENT HUFF

I.   **New Documentary Evidence regarding the Fourth Intentional Misrepresentation by Agent Huff**

On July 22, 2003, a Report of Interview was prepared after an interview with Pedro Navarrete.   The Report was prepared by Special Agent Huff, AUSA Joseph Ruddy and others present.   **This Report of Interview was not provided to the defense until July 14, 2006, well after the *Frank's* Motion had been submitted, heard and denied, and after the criminal trial had already begun.   *See*, Exhibit No. 29.**

¶ 16 states as follows:

"The next smuggling venture detailed and charged in the "Second Superseding Indictment" is that of the F/V Layney D.   Navarrete advised that Pinocho and Tio were the equal contributors on this ill fated smuggling venture. Navarrete stated that **Pinocho contributed 50% and TIO contributed 50%** to the 3,500 kilograms that were aboard the F/V Layney D."

Another ROI of Pedro Navarrete, prepared by agent Meeks, dated December 3, 2003, (***Note***:   this ROI was provided to the defense about one month before the trial began, and well after the *Frank's* Motion had been submitted, heard and denied), with Agent Huff, AUSA Ruddy and others present states at. ¶ 16;  *See*, **Exhibit No. 30.**

**"The next smuggling venture detailed and charged in the "Second Superseding Indictment" is that of the F/V Layney D.   Navarrete advised that Sebas, Pinocho and TIO were all contributors on this ill-fated smuggling venture.   Navarrete advised that his transportation fee for the operation was 10% of the load, plus he added 500 kilograms of his own cocaine to the load.   Navarrete further advised that this operation utilized two vessels, the FV Layney D and another unknown vessel which was owned by Condrito…."**

During the trial of Mario Valencia, the Government called as a witness in their case-in-chief, Pedro Navarrete.   During cross-examination of Pedro Navarrete, he admitted to maintaining personal handwritten notes of who owned which shipments of cocaine.  These notes

became Defendant's Exhibits No. 55 and No. 56.  Nowhere in these notes does the name Mario

Valencia appear.   Pedro Navarrete testified under oath that he provided these notes to Special

Agent Huff (Tr. T. July 26, 2006, pages 77-79, Page 83, Pages 93-94, Page 98 (Doc. 888)).

AUSA Ruddy clearly knew of these notes, but the defense was deprive of them until admitted by

Mr. Navarrete on the stand while testifying at trial. The testimony of Pedro Navarrete and his

notes confirmed that Mario Valencia was never one of the true owners of the F/V Layney D.

Therefore Special Agent Huff's assertion was absolutely false.

## II.    New Evidence from Trial Testimony of Government Witnesses during the Valencia Trial

The  testimony  of  Pedro  Navarrete  and  his  handwritten  notes  confirmed  that  Mario

Valencia was never one of the owners of the F/V Layney D.  (Tr. T. July 27, 2006, Page 186,

Doc. 764)).  Navarette and his notes showed the owners were Sebas, Pinocho and Tio.

The trial testimony of Ms. Santos confirmed she mentioned the seizure of a boat in April

2000, but she never mentioned the Layney D by name.  Most critical to the Defendant's assertion

of the intentional misrepresentation is the fact that the jury found Mario Valencia not guilty on

the Layney D issues.

### III.    CONCLUSION:

This  Honorable  Court  now  has  even  more  definitive  proof  of  the  intentional

misrepresentations made by Special Agent Huff in his affidavit for extradition.  This is the same

or identical information given by Special Agent Huff to the grand jury, which considered the

sufficiency of probable cause in which to return a true bill of the indictment.  The Defendant has

shown the intentional misrepresentations of Special Agent Huff and the reckless manner in

which he offers evidence.  This is the same or identical manner in which Special Agent Huff

testified in the grand jury and which has substantially prejudiced the Defendant such that

immediate production of the grand jury transcript must be authorized in order to protect the

Defendant Constitutional rights and privileges.  The Defendant has shown is particularized need

for such production as this is his only avenue in which to retrieve this damaging document.

## V.      FIFTH ALLEGATION

### *The Alleged Involvement of Valencia in a New York City Cocaine Distribution Organization Uncovered on May 1, 2000 (Predicate Acts 31 & 32)*

#### A.      ALLEGATIONS IN HUFF'S AFFIDAVIT

Finally, Agent Huff alleges that Valencia was a primary source of cocaine for a New

York City cocaine distribution ring led by two Colombian nationals, Hernan Barona Dorado and

Ramon Orozco, which were dismantled beginning with an arrest on May 1, 2000.  Affidavit, ¶

446.  According to Huff, who relies on information provided by informant Ivette Garcia a/k/a

Monica Velilla, in mid-1998 Orozco, who had been distributing cocaine in New York City since

1996-1997, traveled to Cali, Colombia to negotiate with a significant cocaine supplier.  *Id.* at ¶

460.  Dorado then told Garcia that, according to what Orozco told him, the supplier was called

"El Abogado," and was "one of the Valencias."  *Id.* at ¶ 461.  Garcia a/k/a Velilla, informed law

enforcement she told Dorado she knew Mario Valencia and his family and, was surprised at

Garcia's claim.  Dorado told her that Valencia was the organization's new source of supply.  *Id.*

at ¶ 462.

Agent Huff then attests that Dorado assumed control over the New York City operations,

while his partner, Orozco, remained in Colombia "to manage the organization's relationship with

its supplier and to develop contingent suppliers of cocaine."  *Id.* at ¶ 464.  In June or July 1998,

Dorado and Garcia met with a Mexican truck driver who had transported 638 kilograms of

cocaine from Texas to New York City.  *Id.* at ¶¶ 465-466.

Dorado informed Garcia, though, that, in addition to Valencia, whom he referred to as

"El Abogado," Dorado and Orozco had two other sources of supply, known as "Victoria" and

"R."  *Id.* at ¶ 475.  Once the cocaine was sold, Dorado directed Garcia to make payments to

representatives of "El Abogado," "Victoria," and "R." *Id.* at 478. At the end of February 1999, Dorado told Garcia that the 500 kilogram shipment from "Victoria" had arrived. *Id.* at ¶ 479.

In January 2000, Dorado told Garcia that he had just returned from Cali, Colombia, where he and Orozco had met with "Valencia" personally. *Id.* at ¶ 487. On April 6, 2000, USCS agents arrested Garcia, who immediately agreed to work undercover. *Id.* at ¶ 490.

From April 6-May 1, 2000, Garcia made over 200 monitored phone calls to Orozco, Dorado, and others in their organization. *Id.* at ¶ 495. Garcia also met with a warehouse manager she believed was allegedly affiliated with "Valencia". *Id.* Dorado soon traveled from the United States to Cali, and on April 19, 2000 informed Garcia that he was negotiating with "Victoria" for 400 kilograms of cocaine. *Id.* at ¶ 499. In a recorded phone call on April 25, 2000, Dorado told Garcia that he and Orozco were in "El Abogado's" office, negotiating the purchase of 900 kilograms. *Id.* at ¶ 502. Dorado also told Garcia that the deal with "Victoria" "had been postponed." *Id.*

On a phone call the following day, Dorado told Garcia that he had canceled the order from "Victoria," and that he agreed to accept shipment from "El Abogado." *Id.* at ¶ 503. On the following two days, Garcia spoke with Dorado and Orozco, both of whom confirmed that "El Abogado" was sending 900 kilograms. *Id.* at ¶¶ 505-507. On April 30, 2000, Garcia spoke with Gustavo Martinez Ruiz, with whom she met later that day. *Id.* at ¶¶ 508-509. After they exchanged code words that "El Abogado" gave to Dorado, who gave them to Garcia, Martinez told Garcia that he had 144 kilograms of cocaine. *Id.* at 509. Garcia told Martinez that she was expecting 900 kilograms, and he told her to call Dorado because Martinez was only authorized to deliver 144 kilograms. *Id.* On the next day, USCS agents arrested Martinez as he drove the U-Haul, loaded with 140 kilograms, from the warehouse. *Id.* at ¶¶ 516-517. Agents also intercepted an SUV leaving the warehouse, and discovered it contained 293 kilograms of cocaine. *Id.* at ¶ 515. Agents later searched the warehouse, finding 615 kilograms of cocaine.

*Id.* at ¶ 518.  On a May 2, 2000 telephone call, Dorado told Garcia that he had informed "El Abogado" of the problem, and was awaiting his call.  *Id.* at ¶ 520.

Agent Huff attests that Martinez told him that, while in New York City, he was responsible for receiving and distributing two shipments of cocaine from his organization, the first of which was in mid-April 2000 and contained 1480 kilograms, and the second, 900 kilograms, more recently.  *Id.* at ¶ 523.  Martinez allegedly also told Agent Huff that the organization for which he worked transported cocaine by sea to Mexico, where it was transported over the border and then delivered by truck.  *Id.* at ¶ 525.  Agent Huff noted that Martinez expressed fear of retaliation for his cooperation with law enforcement, "and either could not or would not identify the leaders of the drug trafficking organization for whom he worked."  *Id.* at 526.

### B.   INTENTIONAL MISREPRESENTATIONS AND OMISSIONS

Agent Huff attests that Garcia was initially not aware of the identity of the cocaine supplier with whom Orozco was negotiating, but then Dorado told her that he was known as "El Abogado," or "one of the Valencias." Affidavit, ¶ 461. It is clear, however, that the "Valencias" to whom Dorado refers was not Joaquin Mario Valencia Trujillo but was instead the Valencia-Espinosa brothers who are specifically identified in the government's extradition request in the Orozco case.  **Exhibit No. 53.**

Although Agent Huff asserts that the Dorado/Orozco organization's warehouse manager, Gustavo Martinez-Ruiz, worked for the "Valencia organization," Martinez provided no such information whatsoever.  Affidavit, ¶ 495.   In addition, Martinez testified at his guilty plea hearing that he participated in the organization with others named in his indictment, which does not include Mario Valencia.  **Exhibit No. 54**, p. 16-17.  On May 17, 2001, Martinez ultimately received a very short sentence, which reflects that he cooperated with the government.  **Exhibit No. 55**.  Again, Mario Valencia has not been charged in New York for being involved in the

45

Dorado/Orozco organization, which suggests strongly that Martinez did not inculpate Mario Valencia.

More importantly, in the trial of Mario Valencia, Orozco testified under oath that he had never communicated nor met Mario Valencia in person.  (Tr. T. July 11, 2006, pages 191, 193 (Doc. 877)) and (Tr. T. July 10, 2006, pages 135-171 (Doc. 876)).  In fact, as presented through taped conversations between Orozco and Garcia a/k/a Velilla, Orozco states he was at "El Abogado's office as they spoke."  If Orozco was at "El Abogado's" office or in permanent contact with "El Abogado", yet he testified he never met Defendant Mario Valencia, then it clearly must have been some other individual known as "El Abogado" and clearly not Mario Valencia.  There can be absolutely no denial of this conclusion.  To do so otherwise would be an injustice and a completely manipulation of the true facts.

In conclusion, Defendant Valencia more than satisfied his initial burden of demonstrating entitlement to a *Franks* hearing regarding intentional and reckless misrepresentations and material omissions in Agent Huff's affidavit of November 22, 2002.

## NEW EVIDENCE TO SUPPORT PRODUCTION OF THE GRAND JURY TRANSCRIPT OF AGENT HUFF

### I.    New Documentary Evidence regarding the Fifth Intentional Misrepresentation by Agent Huff

Agent Meeks ROI of the debriefing of Monica Velilla dated April 12, 2002, refers to the packages of cocaine bearing the markings of "Christmas Trees" from the Valencia-Espinosa's. *See*, **Exhibit No. 32.**

Agent John Kane's ROI of his explanation of what happened in the New York Operation, page 10, that certain cardboard was marked with the name of a company from Mexico.  *See*, **Exhibit No. 33.**

### II.    New Evidence from Trial Testimony of Government Witnesses during the Valencia Trial

During the trial testimony of Ramon Orozco he stated he never met Mario Valencia.  (Tr. T. July 11, 2006, pages 191, 193 (Doc. 877)) and (Tr. T. July 10, 2006, pages 135-171 (Doc. 876)).  Therefore, during the telephone recordings entered into evidence and subsequently played by the Government during the trial of **Mario Valencia, the reference made to "**El Abogado" cannot therefore be Mario Valencia.  This conduct is yet another clear and obvious *Brady* violation at the hands of the Government.  Why wasn't the Defendant provided this information prior to trial?

The telephone calls and their transcripts placed into evidence at trial showed that Barona Dorado and Ramon Orozco were meeting with the individual known as "El Abogado".

If Ramon Orozco was in meetings with "El Abogado" and yet he never met Mario Valencia, then clearly and rationally "El Abogado" was **__NOT__** Mario Valencia as referenced by the Government and any referenced by Special Agent Huff to the contrary can only be intentional and reckless misrepresentations.   (Tr. T. July 11, 2006, pages 191, 193 (Doc. 877)) and (Tr. T. July 10, 2006, pages 135-171 (Doc. 876)).

Ramon Orozco stated that he met with "Piranha", who is Valencia-Espinosa, the owner of the F/V Macel, and who used the "Christmas Tree" markings on his cocaine packages.  These markings were clearly the "Christmas Tree" markings referenced earlier by Monica Velilla as the "Christmas Trees" from the "Valencias."   The tapes # 109, 131, 145, 148, 160, and Special Agent Huff's Affidavit Paragraphs. 500, 503, 504, 505, 506, 507, show very clearly that these statements were "**__EXCULPATORY__**" evidence because Orozco reports and claims they are in meetings with "Valencia", who they refer to as "El Abogado", **but this is not Mario Valencia because Orozco, in the trial, states he and Barona Dorado never met Mario Valencia**.  This information was clearly in the possession of Special Agent Huff and AUSA Ruddy from at least November 2005 when Orozco was arrested and extradited into the United States and debriefed prior to his trial testimony.

As part of the discovery produced by the Government, the Defendant received a document which refers to "**Sabado Gigante"** as a code word making reference to Mario Valencia's drug loads, but **in the trial, neither Orozco nor Velilla say that this is correct**. *See*, **Exhibit No. 34.**   You can hear on four of the tapes reference being made by Orozco and Dorado about *"Sabados Gigantes"*.   Yet at trial, Ramon Orozco and Monica Velilla testified that *"Sabados Gigantes"* is a television program, not a ***code*** that refers to Mario Valencia.

At the time the Defendant requested a hearing pursuant to *Frank's* in March 2006, the indictment of Ramon Orozco was sealed and was not made available to the Defendant or his counsel.  The indictment was unsealed just prior to trial and only then was the Defendant and his counsel able to see the indictment of Ramon Orozco who was indicted with the **three Valencia-Espinosa's brothers and the F/V Marcel** that contained cocaine packaging markings with "Christmas Trees".   Therefore this indictment was not even remotely involved with Mario Valencia.  (*See*, **Indictment of Ramon Orozco as Exhibit No. 35).**

III.    CONCLUSION:

This Honorable Court now has definitive proof of the intentional misrepresentation made by Special Agent Huff in his affidavit for extradition and certainly the same for his testimony in front of the Grand Jury who considered the charges against the Defendant Mario Valencia. Defendant has clearly demonstrated his particularized need for the production of the Grand Jury transcript of FBI Special Agent Rodrick Huff and shown that the Defendant has no other avenue in which to obtain this information.

## CONCLUSION

The United States Supreme Court acknowledges that 'after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it.'  This matter has come to a critical point in this judicial proceeding where the Defendant's Due Process rights and constitutional protections are to be challenged in the 11th Circuit Court of Appeals and beyond if

necessary.   The Defendant has more than established a pattern of intentional and reckless misrepresentations by the Government showing they intentionally hid and recklessly failed to disclosure exculpatory evidence as well as clear evidence of false statements to the grand jury by Special Agent Huff.   The Defendant has shown through now available trial evidence that was otherwise withheld and concealed prior to trial that the Defendant's assertions of a miscarriage of justice at the highest level of the Government were in fact true.

The Defendant must not continue to suffer through these obvious injustices of constitutional magnitude.   It is clear that the grand jury was provided with intentional and reckless misrepresentations, none of which were supported at the trial of the Defendant.   These intentional, reckless and false statements and testimony form the constitutional basis for the Defendant's right to production of the transcript of testimony of Special Agent Huff and balance heavily in favor of disclosure by this Honorable Court pursuant to the standards established by the United States Supreme Court in the cases and argument outlined herein.

WHEREFORE, for the reasons and the arguments outlined herein, the Defendant would respectfully request that this Honorable Court order the immediately production of the transcript of the grand jury testimony of Special Agent Huff pursuant to Rule 6(e)(3)(E)(i) or in the alternative conduct an "In Camera" review of the testimony by the Court to confirm the representations of the information and arguments contained within this Motion in order to allow the Defendant the opportunity to use this information in his direct appeal.

Respectfully Submitted,

 /S/ Ronald J. Kurpiers, II
Florida Bar No. 0567140
KURPIERS LAW FIRM, P.A.
707 N. Franklin Street, 6th Floor
Tampa, Florida 33602
Tel:    813-637-2900
Fax:    813-637-2905
*Attorney for Joaquin Mario Valencia-Trujillo*
*rkurpiers@rjklawoffices.com*

49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing motion was furnished by CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following persons named below, or by US mail as required this 27th day of August, 2007.

Respectfully Submitted,

<u>/S/ Ronald J. Kurpiers, II</u>
RONALD J. KURPIERS, II
Florida Bar No. 0567140
KURPIERS LAW FIRM, P.A.
707 N. Franklin Street, 6th Floor
Tampa, Florida 33602
Tel:    813-637-2900
Fax:    813-637-2905
*Attorney for Joaquin Mario Valencia-Trujillo*
*rkurpiers@rjklawoffices.com*